Good morning, Your Honors, and may it please the Court. I'm Eric Shumsky, here representing Dish. Your Honors, this Court has repeatedly and recently emphasized the very limited purpose of Section 10J. Injunctions under that provision are meant to be rare in order to avoid what process of the NLRB, which has principal responsibility over disputes concerning purportedly unfair labor practices. That's why Creative Vision makes clear that a Section 10J injunction is only available, first, for harms that are egregious, quote, as measured against other unfair labor practices, and second, where, quote, any final order of the NLRB, and this be meaningless, and the remedial purposes of the Act will be frustrated without an injunction. That's Creative Vision at 299. In short, these injunctions are available to prevent unusually serious and lasting harms. So, for instance, an injunction may be available, and again, this is a quote from Creative Vision, when an unfair labor practice tends to decimate an entire workforce. That's Creative Vision at 300. But here, the District Court didn't apply those legal standards, and if it had those standards, could not be satisfied. First, it failed to perform the comparison that Creative Vision requires. Counsel, have you seen that comparison? Did Creative Vision even engage in that kind of comparison? Here are three precedents where the situation was not as severe. Here are three where it was worse. It seems to me that that is, to some extent, a way to emphasize what the district judge is supposed to do, but I have not seen that carried out in the case law. It has been, Your Honor. The Harrell case, Harrell v. Ridgewood in the Northern District of Alabama, which followed this Court's prior precedents and relied heavily on Creative Vision and understood itself as having to undertake exactly that kind of comparative analysis. And the reason for it is to make sure that the harms truly are, as this Court repeatedly has said, egregious or exceptional. Do you have any circuit court case, Fifth Circuit, that has done this sort of, here are other cases and here's where we put the seriousness in relationship to those other cases? I'm not sure there are any one way or the other since Creative Vision, Your Honor. There's the earlier Third Circuit case in Cobell, and it does or at least talks about a very similar type of inquiry. You're saying Creative Vision essentially overruled our earlier Section 10 cases because you'll concede they didn't do that, right? Well, I don't know that I would say that it overruled them, Your Honor. Well, their approach is we should no longer follow the approach of those two cases, which did not — you agree those earlier cases didn't engage in this explicit comparison. Not in the same type of way, Your Honor. But Creative Vision was interpreting those cases. It relied very heavily on them. And it said, relying on the language of those cases, how do you figure out whether something is egregious or exceptional? You look and see what else is out there as a basis for comparison. I would emphasize that even if the Court reads Creative Vision differently than we're advocating, the fundamental standard, and there's no dispute about this — this is language from pilot freight carriers, and it's the language I quoted a moment ago — that there must be such egregious, unfair labor practices that any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the Act will be frustrating. So why wasn't it at least — again, we're abusing discretion here. So why wasn't it at least within Judge O'Connor's discretion to say, given that this is a 50 percent pay cut, and it was the first time the union was ever trying to negotiate a deal, why couldn't he conclude that that was going to really hurt the union, something that couldn't be remedied by Board action years down the road? Well, because everything that the Court identifies either is harm that absolutely could be remedied by the Board or harm that isn't something that the Act is meant to take care of. How do you remedy the comments of the union workers saying this union's hurting us, it's worse off than before, the leader of the union leaves the company? So I want to answer the question in two parts, if I can. I think the first place to start is to look at other cases. Leave aside what you think about creative vision, but as kind of a benchmark for what's really meant to be — what Section 10J is meant to deal with. So creative vision looks at cases like Hirsch and Moram, where literally the entire union workforce is being decimated, or indeed the union site is being shut down. And the reason for that — and this is the second part of the answer — is that a mere erosion of support isn't the sort of thing that Section 10J is meant to deal with. Creative vision is absolutely explicit about this. It says most, if not all, conduct that's prohibited by the NLRA has the potential to, and often does, cause serious harm to competing unions. That's at 299. And then again at 302, it emphasizes in many cases the union is weakened. And the point of creative vision was to say that's not what gets you an injunction. And so, Judge Costa, to circle back around to your — Alitoso, how much erosion is enough, then? Because you say if it's decimated, it would be appropriate. So how much erosion? What's the standard? Well, so the standard is that it has to be a harm that cannot be repaired by a board order. So what the district court here said is when pay went down, morale went down. All right. Fair enough. And there's some indication of that in the record. But what the district court didn't find and couldn't find is that when pay went up, morale would go back up. What we know here is that we have market wages — Isn't it particularly important here, though, that this was — I mean, take the UAW. They've been representing people at the GM plant for 50 years. Something like this happens, but there's all this goodwill built up among the union members — or maybe not goodwill, but whatever it is that the people sort of have their view of the union developed over a number of decades. Here, it was the very first time the union — they'd just been chosen to be represented. It was the first time the union was trying to negotiate a deal. So — and their wages get cut in half and 20 percent below what anyone else in the company is making. Isn't that just logically going to lead to the types of text messages in the record of, why did we join this union? That was a terrible mistake. But again, Your Honor, the harm has to be irreparable. What you would have to have here is a conclusion that if at the end of the board practices, following the relief that the ALJ, indeed, temporarily has — has awarded here — reinstatement, back pay, the health plan going up — that morale wouldn't recover. But I do want to make sure to emphasize, recall that the district court principally relied upon not the morale, but the financial harms. If you trace through the district court's — One more thing on morale before you can move on to that other point. The Harrell case, a recent Seventh Circuit case, which was in Section 10 involving unilateral changes in employment, like the subject here, how do you distinguish that? Well, so Harrell is a great example, and it's one of a few cases that I would emphasize for Your Honor. So in Harrell, this is the American Red Cross case, there was an 88 percent drop in union attendance. This was not a guess of — Anything but ordinary. That's what that case — failed to demonstrate that anything — anything but ordinary and routine. Was that the language of Harrell? I'm sorry, Your Honor. I didn't hear the question. I'm sorry. I'll try to project that a little more. I said — I thought that under Harrell, the court said that the failure to demonstrate the conduct was anything but ordinary and routine. I'm not sure I'm following the question, but what's clear from Harrell is that there was an 88 percent drop in union attendance. There was a real, live, current harm where the union there was on the brink. Or look at the Lineback case in the Seventh Circuit. It talked about a precipitous decline in union participation. And Judge Costa, that's — But going to your point of what the Board can do, it says the Seventh Circuit has previously found back pay will not remedy the adverse impact to the union and the employees in the interim period. In other words, you can't get back that loss of — of faith in the union. So to be clear — two things, Your Honor. To the extent that what the Seventh Circuit is saying there is that a particular form of harm categorically can't be fixed or that a particular kind of unfair labor practice categorically qualifies for Section 10j relief, this Court has squarely rejected that reasoning, and it did it in creative vision. But I think it's important, Judge Costa, to point out that what the district court was principally relying on here, at least in the discussion that we're talking about, was a loss of numbers, right? What the court said is 17 people left. But what the court ignored entirely is that 19 have been hired. There are innumerable job applications. The Whitney-Smith expert report, which is in the record at 2964 to 72, goes through this. It shows that wages are competitive and, indeed, explains that DISH is actually only hiring 3 percent of applicants. And so the — the court's conclusion that — that numbers were down tells us nothing. Numbers went right back up. Well, it seems to me that what you may be not factoring in and please do is I don't know to what extent Judge O'Connor was saying these were members who at least were there when the union was voted in. New people coming in are not necessarily the equivalent. And so what you're looking at is the union being irreparably harmed by what may be an unfair labor practice, by replacing those who were present, however they voted, and had the experience of the union with people who did not have that participation. Judge Southwick, there is nothing in the record to support that. Recall that there had been a union de-certification. Well, there's certainly something in the record to support that these new people were not part of the union when they — at least until they were employed. So they were not part of this background in this particular location, two locations with the union. So let me address both the people who left and the people who came. First of all, this — there was a prior de-certification petition, because recall at the outset the employees didn't like this QPC plan. And actually, that de-certification petition failed only by 13 to 8. We have no idea who left. It may well be that the people who left were the people who liked the union the least. And that's why I was emphasizing to Judge Costa, what we have here is just this — this assertion about numbers. Some people left, yes, sure, but some people came back. And it's undisputed that they are all part of the bargaining unit. And so to the extent that what the district court was relying on was just this question about numbers, the numbers are back. I do want to get back to the — the point I was starting to try to make to Judge Costa. Recall that the order here is principally focused on financial harms. That's what the district court starts with. And the district court says the drastic cut is exceptional without reference to any other allegations. That's in the record at 2677. That's the district court's order. And the regional director no longer, frankly, really even defends that. The regional director says on the first page of their brief, this case is not about monetary losses, and in direct conflict with what the district court purported to hold as the basis for the injunction, says the wage cut standing alone was not sufficient. That's the regional director's brief at 47. The linchpin for the district court's analysis is the financial harm. And that financial harm doesn't suffice as a matter of law. And the regional director, appropriately, doesn't defend it. And so that's why at page 2680, the district court ends up having to pivot to this sort of extraordinary conclusion that there was a concrete possibility of union dissolution. And there is really no basis whatsoever to conclude that. There is no indication that the union was going to dissolve. There was not, as in El Paso disposal, a decertification petition that was filed. Indeed, the union could not dissolve, because even if there had been a decertification petition, it would have been held in abeyance in the meantime. And that's why the district court ends up having to focus back on this question about loss of numbers and loss of morale. But recall the creative vision. And, again, I want to hasten to emphasize the language I quoted before. Creative vision says there's always going to be some amount of harm. I mean, of course there is. If someone loses their pay, they're going to be less happy with the union than they were before. And creative vision acknowledges that 302, in many cases, the union is weakened. But that's not enough to get this extraordinary form of relief. But what is enough? I think we've had some back and forth trying to define exactly what it is. And I think the answer is that there's no precise formula for what is enough. It's a judgment call. And so if we're in the world of judgment calls, how do you get past the abuse of discretion standard? Well, Your Honor, of course, abuse of discretion doesn't mean unlimited discretion. I think the best way to think about it is that what you need is unusually serious and lasting damage to the union. That is, damage that cannot be remedied by a board decision. And I think it's not an accident that in all of the cases we've been talking about, you see something totally different than what we're talking about here. Creative vision talks about Hirsch and Moran. Hirsch, they were going to shut down the factory and move it halfway across the country. The union's gone. Poof. In Moran, you have something similar. The entire unionized workforce has been fired. I see that I'm in my rebuttal time. You may still be responding to Judge Costa, but do wrap it up. Well, so, Judge Costa, those cases just look totally different. Or something like Harrell and Linebeck, you have clear, present, actual, overwhelming harm to the union, an 88 percent drop in union attendance. And that's just unlike what we have here, which is this sort of vague question about morale and no finding that it won't bounce back. All right, counsel. We'll hear you again in rebuttal. Good morning, Your Honors. May it please the court, Chad Wallace for Martha Kennard, National Labor Relations Board. The big question is, why are we here? Why are we in this forum? And the answer to that question is to ensure that the board's final order is not some meaningless declaration that's announced before an empty room. How do we do that? We do that by affirming the district court's order that rescinded the unlawful unilateral changes of the QPC wage system. But we also need to enter a cease and desist order in joining DISH for making further unilateral changes. The district court's order— What's the status of the board proceeding? The board proceeding, Your Honor, in a 10-J case, they do—the proceeding does get expedited. Both parties—excuse me, DISH has filed exceptions. The general counsel has filed exceptions. It's currently pending before the board. Unfortunately, I don't have a time frame, but it does get fast-tracked because there's a standing injunction. Regarding the injunction on rescission specifically, it was not an abuse of discretion for three reasons. First, under creative vision and the laws of this circuit, the unilateral replacement of QPC was indeed egregious. Second, this case is night and day with creative vision in terms of how the district court order was written, in terms of the facts in the record that there was indeed a likelihood of irreparable harm. A few examples, mass resignations, loss of support. And I will go on shortly to highlight— Well, counsel, are you basically agreeing then with your friend on the other side that this is not a matter of the pay being cut in half, the financial harm? It's the ramifications of that financial harm on the union and the support for the union? That is correct, Your Honor. So how do you read Judge O'Connor? Isn't he emphasizing the wrong thing in his opinion? No, Your Honor. He starts — he makes it very logical where he starts, where the impetus for everything was QPC, and that from there the harms cascaded as a result of that. You start with the wage reduction. Fifty percent is a huge reduction right off the bat. That's people's livelihoods. They had been used to making that amount of money, and then one day they're not making that amount of money. From there, and there is record evidence in front of the district court that employees — there was an inextricable link between employees' views of the union and QPC. They saw them as one and the same. Indeed, there was one employee who testified in front of — I don't recall if it was the district court or the administrative law judge — that when the employer had its presentation announcing that QPC was going away, the employee testified that he understood it that the union was disbanding, which demonstrates that there is this inextricable link between the two. The third reason why it was an abuse of discretion is that the irreparable harm will indeed result in an ineffective final board order because the union's base of support is gone, and the union will likely not survive until the years later when the board does finally issue it. For example, we lost the union steward. The union steward in the NRH unit — a union steward, generally, that's your lifeline between the union and the employees. When you lose that, as I believe it was El Paso Despoja said, that nucleus of support, that's a huge blow to the union's base of support. There's also the text messages between the employees showing that they don't even trust the union to help them anymore. And importantly, the employers' managers told the veteran employees as they were training  specifically, Manager Thomas, he admitted it on direct testimony in front of the district court. He said, do not talk to the new employees about the union. Farmer's branch manager also testified that he told employees not to talk to the new hires about existing litigation. Where the district court did fail, and it was an abuse of discretion, was in failing to grant the cease and desist order against future unilateral changes. In particular, the ALJ's decision that issued shortly after the district court's order made it very clear the number of violations it found, in particular, to unlawfully unilaterally change terms and conditions of employment. For example, and if you'd like to reference this, this is on ROA 2710 as well as page 21 of our record excerpts. For example, they failed to meet and bargain with the union at reasonable times. They unilaterally rescinded QPC. They unilaterally changed the health care plan. They unilaterally changed leave benefits. They unilaterally changed the disciplinary policy. There's abundant evidence that's both discussed in the district court's order and in the record of the various harms that dishes and lawful actions created. Therefore, the judge in failing to the judge recognized that needed a unilateral rescission of QPC, but with all this other evidence of additional unilateral changes in Dish's proclivity to flout labor law, that it was an abuse of discretion and a cease and desist order is necessary to proceed. Dish says you didn't preserve that before the district court. We did preserve it, Your Honor. And we, as we mentioned in our brief, we preserved it in seven instances. I'm going to go to the most important one, which is the district court's order acknowledged, and this was in the first paragraph of the director's request for a cease and disorder when it said, and I quote, Petitioner seeks an injunction prohibiting the alleged unfair labor practices of Dish pending the final disposition of these matters. That was at ROA 2665. There are a number of other points where we preserved it. Remember that the standard here is that the district court had an opportunity to review this particular request. It was not simply just in our petition papers. It was in the briefing material. And again, the district court essentially admits that it did consider it where it mentions it in the first paragraph. Our requirement, and we'll have to look carefully at this, is that you can't just mention it. You just can't intimate it in some scattered ways, but you really need to press the point. And we'll look carefully at your papers to figure that out. Yes, Your Honor. Indeed, the employer essentially admits via their briefing in front of the district court that we did preserve it. In particular, Dish's brief in opposition to the NLRB's petition for injunctive relief, it addressed the director's request for an interim cease and desist when it claimed as, quote, absurd, the director's, and I'm further quoting, this again is from Dish's papers, assertion that injunctive relief is needed to prevent future unfair labor practices on the part of Dish. That's located at ROA 2218 as well as 2255. One thing, another thing I want to talk about is this, the two-part just and proper inquiry that is in Creative. And we agree, it is a two-part inquiry. However, it is not a separate and distinct inquiry. It is, Creative Vision says that it is egregiousness, and the final order is meaningless. And Creative Vision clearly states, and this is at page 299, that the two are, quote, considered in the conjunctive. And, of course, that makes sense. Egregious harm, which is the first part, creates a likelihood that a final board order will be meaningless. They're linked. They have to be considered in the conjunctive. Therefore, this notion that you have to make this categorical comparison of the universe of unfair labor practices or ULPs, as we typically call them, is simply not necessary. The reasonable cause portion, that first part, which, of course, is not at issue on this appeal, but the reasonable cause section takes care of that. It identifies, yes, there is reasonable cause to believe that the act has been violated. We're done there. The next is looking exclusively at the harm, and what did the harms cause. Specifically, and Creative says this, what did the harms cause in this case? Interestingly, I noted that Dish mentioned just now the case of Hershvie-Dorsey Trailers, which is a case where it was the entire workforce, I believe it was the issue of plant closure. Interestingly, that case also says, and I quote, that the 10-J analysis, quote, must be guided by the particular facts in each case. And that's the same issue here, is we need to compare the harms in this case. In particular, and Dish actually makes an excellent point in one of its rebuttal briefs, well, what happens when there's only one UOP? When you have a case where there's a single UOP and therefore there's nothing else to compare it to, compare the harms in this case? Creative answers that, and it answers that because you look at it in the conjunctive. You look at what harms flow from that UOP. Again, here we had the unilateral wage reduction, which led to, and I would say, arguably, a decimation of the unit. It was in the NRH branch of approximately 30 employees, 16 quit. That's over half the unit. If you look at it in the aggregate of the farmers branch and the NRH units, that's 60 employees, 17 quit. That's over a quarter. That's a decimation of the bargaining unit. That's people gone within the first month. Wasn't there a high turnover in any of the facilities, whether they were unionized or not? There was high turnover, but the turnover was lower at the units. But in any event, the question here about turnover, about market rates, these particular views, that's the business lens to look at, and that makes sense from a business standpoint. We're looking at it through the NLRA lens, and it's simply immaterial. The inquiry here is to look at what happened. There was a unilateral change. What was the result of that? Half the employees quit. That bookends the inquiry right there in terms of the harm standards. I'm not following how we can separate what are natural consequences unrelated to an unfair labor practice, if that's what this was, versus some other explanation. It seems to me Creative Vision is saying, in fact, you need to compare this situation to others, and you want us to drain it of any other explanation. It seems to me we've got to look at all the facts, as you told us a little while ago, and among the facts is how uncommon is substantial attrition. I agree. Do you agree? You're saying we need to ignore whether DISH in itself or this kind of business in itself has a fair amount of turnover, and I think we can't ignore that. In determining whether what's happened here is excessive in some sort of comparative way. The comparator, what you need to look at, is versus the harms in this case, and the judge here did that. For example, they compared, they looked at what was the result of the unilateral change. There was the resignations. There was the text messages. We also petitioned for an injunction rescinding the changes to the health care plan. The judge was quite explicit, said the harms were merely speculative. They were not substantial and identifiable. That's the comparison of the harms in this case, as creative vision says. We looked at, the judge looked at the harms, looked at what the record supported in terms of the harms, and he used his discretion, which district courts have wide discretion in this matter, used the discretion to determine that it was only just and proper to rescind the unilateral change. Also, in terms of the level of harm, one distinction I want to make is the standard is not irreparable harm. It is the likelihood of irreparable harm. The definition of irreparable harm is it cannot be repaired. It's too late. And the harm standard that DIS suggests is simply too high. To look for this type of imminent, irrevocable, unequivocal irreparable harm would moot 10J completely, because at that point it's simply too late. Neither an injunction nor a final board order would be effective. The inquiry is the likelihood of irreparable harm, which is exactly what we had here. It was moving towards a point of irreparable, but the point of 10J is to move in and freeze the situation, move it to the status quo ante, and preserve it before a final board order. In particular, I do want to discuss the fact that it was manifestly egregious that the harms that were caused by the unilateral change, the mass resignations that I mentioned earlier in terms of 50% of NRH, a quarter of the entire unit, there were employees who quit and testified they wouldn't even come back, even if QPC was restored, because they did not trust that the union would be able to stop the employer from making further unilateral changes. As a reference, that's at ROA 2827. There was an affidavit that said that he had quit, he moved out of state, he wasn't coming back. In particular, the one that really puts a fine point on this is the union steward at NRH. He was the go-between between the union and the employees. Originally, he was the real cheerleader for the employees saying, hey, stick it out, stay with it, the union will be able to help us, the board will be able to help us. By October, even he succumbed to the apathy and he quit. So they lost a huge nucleus of support. And what's worse is no employee stepped in their place, and it's not because no employee wanted it, it's because employees were afraid. Remember that the district court wasn't entirely sure about the effect of the text message saying, the union is gone, QPC is gone, in terms of what was facetious, what was suggestive. These were small, isolated points. What's important is that employees knew that the union was gone and that support was quickly draining from it. Further, employees said, what does it even matter? The union is a third party to this. Another said he's getting to the end of his rope financially. In any event, the point is, the harms here were egregious. They were exceptional. And the facts on the ground at the time when this order was put in was that the union was at the point of losing all support. The unilateral change of QPC was egregious harm. The district court did not abuse its discretion in instituting it. And further, it did abuse its discretion in failing to issue a cease and desist order. I see that I'm about at the end of my time. If your honors have no more questions, I'll cede back the balance. All right, counsel. Thank you. Thank you. We'll hear from Mr. Holder. May it please the Court. Matt Holder for Amicus Geri, Communication Workers of America. This case involves a situation where economic injury to employees cannot be separated from the injury to the union status as their recognized representative for the purposes of collective bargaining under the National Labor Relations Act. The testimony before the district court established that bargaining unit employees were drifting away from the union because of the wage cut imposed by DISH unlawfully as found by the administrative law judge. And that caused them to second-guess their decision to seek a representative for the purpose of collective bargaining. And as to looking at the issue of how can you attribute the losses at Farmers Ranch and North Richland Hills to the wage cut, the employees testified to that at the administrative law judge hearing. They further, in the district court proceeding, testified as to how this had shaken their support for the union. I would also like to point out that this case is the converse of an earlier case decided by the court, Warby Teamsters from the 1970s, where the court enjoined strike conduct by a union where the strike was going to pose both economic loss to the employer or force the employer to acquiesce to the union and permit the union to gain a toehold. Here the union has, in this case, more than a toehold. We are the certified representative and the company is trying to dislodge us through this wage cut. And the best evidence that this is the company's intent is found in the text message that was sent out by a manager stating that the union is gone, we are cutting wages in half, and we want people to quit en masse. So there's no doubt as to the motive in this case as to why the company cut wages. They did it to seek to force employees to quit. And, again, this is the converse of the Teamsters case from the 1970s. It is a union where, yes, there are economic damages that theoretically could be remedied at the conclusion of board proceedings, but the damage to the union's standing cannot. If everyone leaves and there are no supporters, then the union cannot be an effective collective bargaining representative for whoever remains. And there's additional evidence in the record showing that managers were instructing people not to talk about the union, so there would be no way to proselytize the new hires. And with that, I thank you for your time. Your Honors, I'd like to make no more than three or four hopefully quick points. First of all, I think the most critical thing that we've heard this morning is the justification that the regional director just provided. It is full of hyperbole, things like the union will not survive, based on facts that the district court specifically declined to rely upon. And the fact that even now here today, that kind of backfilling, contrary to the district court's own findings as to what's going on, First, that they lost the union steward. The district court said that the court would only look at that for notice purposes. That's at 2743, declined to rely on that. Second, the statements by or the statement by Waylon Thomas about employees not discussing the union with new hires. The district court specifically declined to rely on that and specifically found that that was a misunderstanding. That's at 2670 and 2683. Third, a broad assertion that multiple people said they would quit and aren't coming back. No, one person said that. If we had a whole bunch of people saying, that's it, I'm gone, union's terrible, we're never coming back no matter what, we would have a really different case here today. The record does not support that. Next, the Obear text message at 1643 to 45. The district court specifically declines to rely on it. That's at 2683. And, in fact, Obear knew nothing about what was going on or what Dish's bargaining strategy was. And none of it actually has happened. The union, the locations. Counsel, let me ask you a question. What was the economic loss to the company that precipitated this whole ruckus? What was the economic loss? That you were paying higher wages in those particular units, correct? Well, not just that they were higher, that they were so much higher. I understand that, but they were very high. But they were high because what you had done was to put in place an incentive program, which rewarded employees for their actual performance levels, that they didn't get that many recalls when they installed, et cetera, et cetera, that they were performing at a much more efficient level. And I understood, perhaps I'm mistaken, that then what happens is that the technology changed and that an employee could still not work at those levels, but the technological advances enabled them to get the same kind of results. So for a much lower level employee, you could still achieve those results. And so what you did then was to can those people that were working. And my characterization, you don't have to agree with, but that's what comes true to me that you were doing here. Yeah, we were paying these people. Look, it's completely out of line. They're making $60,000 a year and these other people are making it. Well, they got the $60,000 a year because of your incentive program. Is that correct? I mean, they didn't steal the money. Well, to be sure, Your Honor. No, no, no. Just answer my question. Yes. Yes, Your Honor. Okay. Then what happened is that you no longer needed to incentivize those employees because technologically you could get the same kinds of results with a much lower level wage employee. Yes, Your Honor. Okay. And so you can. Then you can. That was your justification for you getting rid of the employees. Not for nonperformance, but cost simply. You could use cheaper employees there. Well, to be clear, Your Honor, I mean, there's a long history here and a lot of fight, and that's what the Board is going to be dealing with. But the legal inquiry here is whether there's a— I don't know what the legal inquiry is, but I just want to be sure we're clear about what happened here. Yes, Your Honor. Both the employer, both DISH and the union, changed their perspective on QPC. Originally, the employees hated QPC, and that's why they wanted to decertify the union. And then when technology turned around, there was this two-year blip or windfall, and the best example of this is at 2947. My friend on the other side said that the employees were used to making that money. Well, they were used to making it for a limited two-year period in there. And then the question here is whether a Board— the performance goals without them having to meet them themselves. Yes, Your Honor. Again, I'm not— That's the windfall that you're talking about. The same services were ultimately being given. It was just costing you more money that you no longer had to pay. Yes, Your Honor. May I finish answering the question? Yes, Your Honor. That is factually correct, but none of that goes to the question of whether this is a situation that a final Board order could not remedy, that an order from the Board would be meaningless, and it wouldn't be. All right, counsel. Thank you. We'll thank all participants in this. We'll take a brief recess.